1 | KATHLEEN BLISS
Nevada Bar No. 7606
2 | E-Mail: kathleen.bliss@lewisbrisbois.com
CHERYL A. GRAMES
3 | Nevada Bar No. 12752
E-Mail: cheryl.grames@lewisbrisbois.com
4 | LEWIS BRISBOIS BISGAARD & SMITH LLP
6385 S. Rainbow Boulevard, Suite 600
5 | Las Vegas, Nevada 89118
TEL: 702.893.3383
6 | FAX: 702.893.3789

7 | THOMAS A. MESEREAU, JR., ESQ.
California Bar No. 091182
8 | MESEREAU & YU, LLP
10390 Santa Monica Blvd., Ste. 220
9 | Los Angeles, CA 90025
TEL: 310.789.1177
10 | FAX: 310.861.1007

11 | Attorneys for Vinay Bararia

12

UNITED STATES DISTRICT COURT

13

DISTRICT OF NEVADA

14

15

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 2:12-cr-236-JAD-GWF |
| Plaintiff, | |
| vs. | Sentencing Date: April 10, 2014 |
| VINAY BARARIA, | |
| Defendant. | |

21

## **DEFENDANT'S SENTENCING MEMORANDUM**

22

### **OVERVIEW**

23

Defendant Vinay Bararia ("Dr. Bararia"), by his counsel, submits this Sentencing Memorandum in support of his request for this Court to depart and vary downward from the United States Sentencing Guideline Range of 87-108 months (Offense Level 29) to a sentence of no more than 30 – 37 months (Offense Level 19). Further, Dr. Bararia requests that, after credit given for time served, this Court impose in lieu of any remaining term of imprisonment under the Guidelines, an alternative punishment, such as home confinement.

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

Dr. Bararia submits that numerous bases support his request, including:

(a)   the recent efforts of both the U.S. Sentencing Commission and the U.S. Department of Justice to lower by two the offense levels for certain drug trafficking offenses, which is unopposed by the Government;

(b)   at least a two-level downward departure based on Dr. Bararia's diminished capacity due to his previously undiagnosed and consequently untreated medical disorder, as identified and explained by two medical doctors;

(c)   at least a two-level downward departure based on Dr. Bararia's family circumstances, particularly his family's dependence upon him for financial support, emotional stability and all of the other ineffable contributions a father and son make to loved ones; and,

(d)   at least a four-level downward variance based on:

(1)   how out-of-character his illegal conduct was when viewed alongside his otherwise exceptional career of helping others;

(2)   his inability to practice medicine again;

(3)   his significant community and religious ties;

(4)   the Government's tainted and over-reaching investigation of him – called "Operation Slumdog Billionaire" -- which included misrepresentations to the Court and other conduct which the Magistrate Court characterized as "deplorable;" and,

(5)   Dr. Bararia's pre- and post-indictment conduct, including his immediate confession, his unsolicited willingness to assist law enforcement, and his efforts to improve the quality of life for others while in pretrial detention for the last 18 months.

Furthermore, Dr. Bararia will demonstrate in his points and authorities that significant reduction of his sentence meets all of the factors this Court must consider in imposing a sentence under 18 U.S.C. §3553, particularly that it is a fair sentence compared to similarly situated defendants, it accounts fully for the conduct violated herein, and it serves as an appropriate deterrent.

As the Ninth Circuit has observed, a downward variance under 18 U.S.C. §3553 may be appropriate based upon a defendant's history and characteristics, as well as the degree of remorse and acceptance of responsibility given by that particular defendant. *United States v. Edwards*, 595 F.3d 1004, 1016-17 (9th Cir. 2010) (where court affirmed a probation-only sentence for the defendant, whom the sentencing judge had determined was sincerely remorseful for his conduct). *See also, United States v. Husein*, 478 F.3d 318, 333 (8th Cir. 2007) (court varied downward based upon family circumstances from a guideline range of 37 – 46 months for drug trafficking to home confinement and one day in jail based on family circumstances and noting that "[t]he extent

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

of a downward departure or variance . . . should bear an inversely proportional relationship to the 'evilness of the crime, and the criminal, at issue."). Indeed, 18 U.S.C. §3553(a) "does not require the goal of general deterrence be met through a period of incarceration." *Edwards*, 595 F.3d at 1016.

Therefore, this Memorandum also summarizes the nature and circumstances of the offense as well as Dr. Bararia's history and characteristics to demonstrate to the Court that further incarceration at this stage is not a reasonable sentence in light of the factors mandated by 18 U.S.C. §3553. The Court should consider the fact that Dr. Bararia has no prior criminal history, and he offered to assist the Government in rooting out local healthcare fraud. However, the Government rejected his assistance, after having subjected him to an investigation that clearly violated Dr. Bararia's constitutional and statutory rights. Moreover, for years, he devoted himself to helping his patients, and through this demanding career, he provided stable financial support for his wife and young children, who remain dependent on him in every way. Finally, as his letters of support show, he exhibits a sincere and deep remorse for his actions.

As discussed herein, there are many compelling and extraordinary reasons for this Court to spare Dr. Bararia from further incarceration beyond that which he has already served, as follows:

(1)  Dr. Bararia's years of exceptional dedication to his medical practice show the aberrance of his illegal conduct;

(2)  Government conduct throughout the racially slurred "Operation Slumdog Billionaire" should offset Dr. Bararia's relevant conduct because the Government should not reap the benefits of a tainted investigation;

(3)  further incarceration has no affect on the fact that Dr. Bararia is now a physician in title only. As the United States Probation Officer observed, Dr. Bararia forfeited and cannot regain the career to which he devoted the majority of his life as a student and then as a practitioner;

(4)  Dr. Bararia's 18 months in detention, during which he exhibited absolutely model behavior, despite a serious, untreated medical condition, also shows he remains committed to servicing others;

(5)  Dr. Bararia's untreated medical condition is best addressed in a clinical environment outside the Federal Bureau of Prisons system, as pointed out by a medical expert.

(6)  demonstrable and palpable remorse for his conduct and for the impact it has had on his entire family, including a struggling wife, adolescent girls, aging parents and a baby son with whom Dr. Bararia has interacted only briefly.

/ / /

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4841-0361-8073.1                                   3                          2:12-cr-236-JAD-GWF

**PROCEDURAL HISTORY OF THE CASE**

1

2       After a nine-month investigation, on March 2, 2012, the Government filed a Complaint

3   against Dr. Bararia, alleging he distributed controlled substances in violation of 18 U.S.C § 841(a),

4   (b). (Docket "Doc." No. 1). He immediately confessed and one month later offered to assist the

5   Government in uncovering providers and institutions engaging in health care fraud. (C. McKenna

6   Report of Inv., Apr. 2, 2014, attached hereto as Exhibit A). At his initial appearance, Dr. Bararia

7   was released with conditions, including a condition that he not prescribe or order controlled

8   substances. (Doc. No. 5). However, while continuing to fulfill his duties at Centennial Hills

9   Hospital, Dr. Bararia signed off on orders for controlled and non-controlled substances in a

10  number of hospitalized patients' charts.  Because of this, the Government sought to revoke Dr.

11  Bararia's pretrial release.  At the revocation hearing, the Magistrate Court found that although the

12  condition of release itself was clear, how it was applied "as it related to the work of the hospital"

13  was confusing. (*See* Tr. Revocation Hearing May 16, 2013 at 159:23-24). As such, the Magistrate

14  Court did not revoke his release. (*Id.*).

15      Five months later, the Government again sought revocation of Dr. Bararia's pretrial

16  release, arguing that he had violated the same condition of release by writing prescriptions for

17  controlled substances. (Doc. No. 50). This time, the Magistrate Court revoked Dr. Bararia's

18  release, finding unpersuasive his argument that his violation had occurred as a part of his duty to

19  maintain a continuity of care for his patients, and that he had prescribed testosterone, a drug not

20  relevant to the investigation herein. (Doc. No. 54). Since October 20, 2012, Dr. Bararia's detention

21  has been that of a model detainee, including his tutoring and mentoring of other pretrial detainees

22  as they earned GEDs and English language skills. (See P. Cook Ltr., attached hereto as Exhibit B).

23      Dr. Bararia vigorously challenged the Government's conduct during its investigation.  On

24  the eve of an evidentiary hearing on the Government's administration of a 60-day wiretap of

25  Defendant's cellphone, the parties reached a plea agreement, whereby on December 18, 2013,

26  Defendant pleaded guilty to distributing 498 hydrocodone pills on July 20, 2012 to an undercover

27  agent. (Doc. No. 186).

28      On February 26, 2014, the U.S. Probation Office provided the parties with its presentence

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  report ("PSR"). The U.S. Probation Officer recognized that this Guideline Range is greater than

2  what is necessary to satisfy the requirements of 18 U.S.C. § 3553, and recommended a downward

3  variance of 27 months, resulting in a 60-month term of incarceration, followed by a three-year

4  period of supervised release that includes several special conditions. (PSR at 25-26). The PSR

5  focused on the following factors that justify a downward variance: Dr. Bararia's mental health

6  condition, his family circumstances, and how "the loss of his ability to practice medicine is . . . a

7  tremendous punishment to someone who seems so focus[ed] on success, prestige, and respect."

8  (PSR at 21). Dr. Bararia and the Government provided written objections to the U.S. Probation

9  Office; and on March 19, 2014, that office issued a revised PSR, addressing these objections. Dr.

10  Bararia's Sentencing Hearing is set for April 10, 2014 at 9:00 a.m.

11  **LEGAL ANALYSIS OF SENTENCING GUIDELINES**

12  A court "shall impose a sentence sufficient, but not greater than necessary," to comply with

13  the following purposes:

14      (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

15      (B)    to afford adequate deterrence to criminal conduct;

16      (C)    to protect the public from further crimes of the defendant; and

17      (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18  18 U.S.C. §3553(a). The other factors under Section 3553 that a court must consider are:

19      (1)    The nature and circumstances of the offense and the history and characteristics of the defendant;

20      (2)    The need for the sentence imposed (see *supra*);

21      (3)    The kinds of sentences available;

22      (4)    The kinds of sentence and the sentencing ranged established for [the offense];

23      (5)    Any pertinent policy statement [by the Sentencing Guidelines Commission]

24      (6)    The need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and

25      (7)    The need to provide restitution to any victims of the offense.

*Id.*

26  In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the then-

27  mandatory Sentencing guidelines system violated the Sixth Amendment. As a result, the Supreme

28  

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  Court in *Booker* rendered the Sentencing Guidelines "advisory." The Court has since clarified

2  that, in addition to being advisory, the Guidelines "now serve as one factor among several [that]

3  courts must consider in determining an appropriate sentence." *Kimbrough v. United States*, 552

4  U.S. 85, 90 (2007). Moreover, the Guidelines are not to be presumed reasonable by a sentencing

5  court. *Gall v. United States*, 552 U.S. 38, 50 (2007) (holding that standard for review of sentences

6  imposed outside of the Guidelines are viewed under a deferential abuse-of-discretion standard and

7  finding that the sentence imposed – a variance from a low-end of 30 months imprisonment to

8  probation – was reasonable). Thus, while a sentencing court must begin the process of determining

9  an appropriate sentence by calculating the applicable Guidelines range, it "should then consider all

10  of the Section 3553(a) factors to determine whether they support the sentence requested by a

11  party." *Gall*, 552 U.S. at 49-50; *see United States v. Grossman*, 513 F.3d 592, 595-96 (6th Cir.

12  2008) (applying *Gall* to finding that sentence variance from 120 months to 66 months in a child

13  pornography case reasonable and noting that in sentencing, "district judges are involved in an

14  exercise of judgment, not a ritual.") (internal citations omitted).

15      The Ninth Circuit allows a full consideration of the nature and circumstances of the offense

16  as well as the history and characteristics of the defendant. For example, in *Edwards*, the Ninth

17  Circuit affirmed the sentencing judge's downward variance to probation, based on the defendant's

18  history and characteristics. *Edwards*, 595 F.3d at 1016-17. The defendant was 63, suffered from

19  diabetes, and had committed similar offenses. *Id.* 1010-11. The sentencing judge stated that, even

20  though the defendant had "committed . . . a very serious offense," the defendant "appeared in

21  district court 'a totally different person,' thus prompting the sentencing judge to conclude that "I

22  don't think there's a chance in hell that he's going to engage in this again in the future." *Id.* at

23  1015.

24      Therefore, arguments previously made for departures, even those made on prohibited or

25  discouraged grounds under the Guidelines, such as exceptional family circumstances, now must be

26  considered under Section 3553(a) as variances. *See United States v. Menyweather*, 431 F.3d 692,

27  700 (9th Cir. 2005) (*Booker* enables sentencing courts to consider "a multitude" of factors and

28  circumstances that the Sentencing Guidelines deem irrelevant, such as age, employment and

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1   family circumstances under Section 3553(a)); *accord, United States v. Chase*, 560 F.3d 828 (8th

2   Cir. 2009) (holding that a circumstance prohibited for departure may be considered as a basis for a

3   variance). *See also United States v. Rangel*, 697 F.3d 795, 801 (9th Cir. 2012) (explaining

4   difference between a departure and a variance).[1]

5         Judges are thus permitted now to impose a subjectively "reasonable sentence" that

6   considers variances for physical and mental health conditions, employment history, contributions

7   to one's community, and lack of criminal record – all of which were previously discouraged

8   factors under the mandatory Guidelines, but which are all applicable in this case in fashioning an

9   appropriate sentence.  One court even applied a variance in a counterfeit access card case in

10  violation of the Digital Millennium Copyright Act based in large part on the district court's

11  finding that the defendant's crime "[d]id not pose the same danger to the community as many

12  other crimes." *United States v. Whitehead*, 532 F.3d 991, 993 (9th Cir. 2008); *see also United*

13  *States v. Davidovici*, 2:12-cr-91-KJD-PAL (court rejected a term of imprisonment as unreasonable

14  and imposed a three-year term of probation for a tax evader who was diagnosed with acute optic

15  neuropathy (Sentencing Tr. and Judgment attached as Exhibit C)).

16        Section 3553(a), "as modified by *Booker*, contains an overarching provision instructing

17  district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the

18  goals of sentencing. . . ." *Kimbrough*, 522 U.S. at 89 (citing sentencing goals and purposes set

19  forth at 18 U.S.C. §3553(a)(2)(A)-(D)). Indeed, according to statistics compiled by the U.S.

20  Sentencing Commission since *Booker*, below-Guideline variances are increasing, from 12% of all

21  sentences imposed in 2006, to 17.4% in 2011, while sentences within the Guidelines continue to

22  decrease, from 61.7% of all sentences imposed in 2006 to 54.5% in 2011.  This downturn is

23

24  _____

25  [1] "A 'departure' is typically a change from the final sentencing range computed by examining the provisions of the Guidelines themselves.  It is frequently triggered by a prosecution request to reward cooperation . . . or by other factors that take the case 'outside the heartland' contemplated

26  by the Sentencing Commission when it drafted the Guidelines for a typical offense.  A 'variance,' by contrast, occurs when a judge imposes a sentence above or below the otherwise properly

27  calculated final sentencing range based on application of the other statutory factors in 18 U.S.C. § 3553(a)." *Rangel*, 697 F.3d at 801 (internal citations omitted).

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4841-0361-8073.1                                              7                          2:12-cr-236-JAD-GWF

1  logical in light of the post-*Booker* reasoning: that courts should impose the minimum sentence

2  necessary to reflect the factors delineated in 18 U.S.C. §3553(a). *See United States v. Ministro-*

3  *Tapia*, 470 F.3d 137, 142 (2d Cir. 2006); *see also United States v. Parris*, 573 F.Supp. 2d 744, 755

4  (E.D.N.Y. 2008) (rejecting the "one-size-fits-all" approach of the advisory Guidelines relative to

5  fraud cases and imposing a sentence of 60 months as necessary to accomplish the factors

6  enumerated by Section 3553(a), resulting in a variance of 300 months for securities fraud violators

7  convicted by a jury and who had no apparent mitigating circumstances).

8       Moreover, 18 U.S.C. §3553(a) "does not require the goal of general deterrence be met

9  through a period of incarceration." *Edwards*, 595 F.3d at 1010 (affirming district court's reasoning

10  that "there's nothing to be gained based on the circumstances of the offense and his history and

11  characteristics by incarcerating him."). This is so because other sentencing options, even a

12  sentence of probation only, can satisfy the "basic purposes of sentencing: deterrence,

13  incapacitation, just punishment, and rehabilitation." *United States v. Martinez-Guerrero*, 987 F.2d

14  618, 621 (9th Cir. 1993) (internal quotations and citations omitted). For example, in *Gall*, the

15  sentencing court sentenced defendant to probation only, and Court of Appeals reversed.  However,

16  the Court rejected the Eighth Circuit' rigid "mathematical approach" to variances and reversed

17  because the sentencing court was within its discretion to determine that a period of incarceration:

18      May work to promote not respect, but derision, of the law if the law is viewed as
   merely a means to dispense harsh punishment without taking into account the real
19      conduct and circumstances involved in sentencing.

20  *Id.* at 54 (internal quotations omitted).

21       As this Court doubtless knows, 18 U.S.C. §3553(a) provides that, in determining the

22  appropriate sentence, a district court must "make an individualized assessment based on the facts

23  presented."  Here, an individualized assessment, based on the following factors, shows that further

24  incarceration is not reasonable under the circumstances of the case, and is greater than necessary

25  to satisfy the sentencing requirements at 18 U.S.C. §3553.

26  / / /

27  / / /

28  / / /

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4841-0361-8073.1         8         2:12-cr-236-JAD-GWF

1   **FACTORS WARRANTING DOWNWARD DEPARTURE AND VARIANCE**

2   **A.    Dr. Bararia Respectfully Requests This Court Apply the Two-Level Departure As
3            Promulgated By The U.S. Sentencing Commission and the U.S. Department of
         Justice.**

4            The U.S. Sentencing Commission ("U.S.S.C.") promulgated a proposed rule amendment to

5   lower by two the offense level for certain drug trafficking offenses. (See 79 Fed. Reg. 3280

6   (January 14, 2014), attached hereto as Exhibit D). Although the U.S.S.C. and Congress have not

7   yet voted on these changes, on March 13, 2014, Attorney General Eric Holder appeared before the

8   U.S.S.C. to endorse the proposed amendment, commonly referred to as "D Minus Two." The

9   offense to which Dr. Bararia pleaded guilty (distributing controlled substances, a violation of 18

10  U.S.C. § 841) falls within the proposed amendment. At his appearance, AG Holder stated his

11  intent to direct prosecutors not to object if defendants seek to have the proposed lower guidelines

12  applied to their case at sentencing. (See "*AG Endorses Proposed Changes to Drug Sentencing*

13  *Guidelines*," available at http://news.uscourts.gov/ag-endorses-proposed-changes-drug-sentencing-

14  guidelines, last accessed on March 17, 2014, and "*Attorney General Holder Urges Changes in*

15  *Federal Sentencing Guidelines to Reserve Harshest Penalties for Most Serious Drug Traffickers*,"

16  available at http://www.justice.gov/printf/PrintOut3.jsp, last accessed on March 17, 2014, attached

17  hereto as Exhibit E). As AG Holder stated, "[C]ertain types of cases result in too many Americans

18  going to prison for too long, and at times for no truly good public safety reason."

19          Dr. Bararia's is such a case because he no longer poses a threat to the public's safety.  Dr.

20  Bararia relinquished his ability to practice medicine in Nevada, thereby terminating decisively and

21  permanently the means through which he obtained controlled substances.  As such, the proposed

22  change, which reduces the Offense Level from 29 to 27, a difference of 17 months (87 – 108

23  months down to 70 – 87 months), is appropriate in this matter.

24          The Government has represented that it will not oppose a departure on this basis. (See S.

25  Cushman E-mail Correspondence, March 17, 2014, attached hereto as Exhibit F).

26  **B.    Dr. Bararia's Bipolar Disorder Merits At Least A Two-Level Downward Departure
27            For Diminished Mental Capacity Under U.S.S.G. § 5K2.13.**

        The U.S.S.G. recognizes that a downward departure may be appropriate to reflect the

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4841-0361-8073.1                                    9                           2:12-cr-236-JAD-GWF

1  impact that a defendant's mental health condition had on his illegal conduct:

2  § 5K2.13.  Diminished Capacity (Policy Statement)

3  A downward departure may be warranted if (1) the defendant committed the
offense while suffering from a significantly reduced mental capacity; and (2) the
4  significantly reduced mental capacity contributed substantially to the commission
of the offense. Similarly, if a departure is warranted under this policy statement, the
5  extent of the departure should reflect the extent to which the reduced mental
6  capacity contributed to the commission of the offense.

7  However, the court may not depart below the applicable guideline range if (1) the
significantly reduced mental capacity was caused by the voluntary use of drugs or
8  other intoxicants; (2) the facts and circumstances of the defendant's offense indicate
a need to protect the public because the offense involved actual violence or a
9  serious threat of violence; (3) the defendant's criminal history indicates a need to
incarcerate the defendant to protect the public; or (4) the defendant has been
10  convicted of an offense under chapter 71, 109A, 110, or 117, of title 18, United
11  States Code.

12  18 USCS Appx § 5K2.13. The Guidelines also provide the following application note when

13  considering a departure on this ground:

14  Application Note:

1. For purposes of this policy statement--

15  "Significantly reduced mental capacity" means the defendant, although
16  convicted, has a significantly impaired ability to (A) understand the wrongfulness
of the behavior comprising the offense or to exercise the power of reason; or (B)
17  control behavior that the defendant knows is wrongful.

18  *Id.*

19  The Ninth Circuit has held that a downward departure under U.S.S.G. § 5K2.13 may be

20  appropriate when: (1) an ailment distorted a defendant's reasoning; (2) interfered with his ability

21  to make considered decisions, and (3) contributed to the commission of the offense in some way.

22  *Menyweather*, 447 F.3d at 632, *accord United States v. Cantu*, 12 F.3d 1506, 1513, 1515 (9th Cir.

23  1993). In *Menyweather*, the district court did not abuse its discretion in considering the "detailed

24  opinion of a licensed psychologist" regarding her post-traumatic stress disorder and its impact on

25  her embezzlement of government funds. *Menyweather*, 447 F.3d at 632. Similarly, in *Cantu*, the

26  defendant also suffered from post-traumatic stress disorder arising from his service as a Marine in

27  Vietnam. *Cantu*, 12 F.3d at 1509. Despite his brandishing a firearm and chronic alcoholism, the

28  Ninth Circuit found the sentencing court erred by not applying a downward departure for

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4841-0361-8073.1                10                2:12-cr-236-JAD-GWF

1 diminished capacity. *Id.* at 1516-17.

2      In determining the appropriate number of levels to depart downward for diminished

3 capacity, the Ninth Circuit has held that the degree of departure relates to the degree of the

4 impairment:

5      The defendant's eligibility remains the same whether his impairment contributed
       greatly to the commission of his offense, or hardly at all. Rather, the degree to
6      which the impairment contributed to the commission of the offense constitutes the
       degree to which the defendant's punishment should be reduced.
7

8 *Id.* at 1515. Additionally, the Ninth Circuit collected diminished capacity cases in *Menyweather*,

9 noting that the degree of departure "generally range[s] between one and four levels."

10 *Menyweather*, 447 F.3d at 635 (where sentencing court ultimately departed downward by 8 levels,

11 based on a combination of diminished capacity and family circumstances).

12      Here, Dr. Bararia's previously undiagnosed condition of bipolar disorder compromised his

13 ability to self-regulate and emboldened him to act in ways utterly contrary to his years and years

14 of dedication to his patients, family, and community. He, like many physicians who pay scant

15 attention to their own health, did not recognize the symptoms of bipolar disorder that were evident

16 upon examination by a noted expert, Norton A. Roitman, M.D. Dr. Roitman's reports are attached

17 as Sealed Exhibit G.[2] Dr. Roitman opined that Dr. Bararia exhibited symptoms of the manic phase

18 of his condition during his illegal conduct, including his frantic measures to try to salvage his

19 medical practice after he had been arrested and released. (*See* Sealed Exhibit G). He also opined

20 that Dr. Bararia currently is in the midst of the depressive phase of his condition. (*Id.*). As such, he

21 opined that Dr. Bararia's condition necessitated immediate release because initiating Dr. Bararia's

22

23 _____

24 [2] Among the records that Dr. Roitman reviewed are Dr. Bararia's medical records relating to a
   cardiac event that occurred upon his arrest, when Dr. Bararia complained of chest pain to the U.S.
   Marshals. However, they refused to send him to the hospital at that time, instead sending him to
25 the Pahrump detention facility. 36 hours later, Dr. Bararia finally received a cardiac examination
   at Desert View Hospital (in Pahrump). The cardiologist noted that the echocardiogram supported
26 a finding of ischemia (restriction of blood supply to tissue) to the endocardial layer of his heart,
   with concentric hypertrophy and an ejection fraction of only 65%. Dr. Bararia had no such prior
27 cardiac issues prior to arrest, thus supporting Dr. Bararia's contention that he needlessly suffered
   cardiac injury because of the Government's delay in transporting him to a hospital.

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4841-0361-8073.1                    11                    2:12-cr-236-JAD-GWF

1   treatment during detainment posed serious risk to worsening the depression.[3] Another well-

2   respected expert, Latricia Coffey, M.D., has also examined Dr. Bararia, but with an eye to

3   formulating a treatment plan; she also concluded that Dr. Bararia suffers from bipolar disorder.

4   Dr. Coffey's report is attached as Sealed Exhibit H, and she is prepared to testify at Dr. Bararia's

5   sentencing hearing.

6          Thus, like the defendant's post traumatic stress disorder in *Menyweather*, Dr. Bararia's

7   bipolar disorder sheds light on why an otherwise deeply religious man and exceptionally gifted

8   practitioner, so devoted to his family, veered erratically and destructively from his path of hard

9   work and dedication. Bipolar disorder, just like PTSD, imposes a deleterious impact on the

10  afflicted person's ability to control her or his behavior. A downward departure of at least two

11  levels, therefore, is appropriate in this case.

12         Finally, the Guideline's articulated exceptions to departing on the ground of diminished

13  capacity are not present in this matter. Dr. Bararia's bipolar disorder was not caused by voluntary

14  drug use; this was not a crime of violence as defined at U.S.S.G. § 4B1.2; Dr. Bararia has no

15  previous criminal history; and, he has not been convicted of an offense under chapter 71, 109A,

16  110, or 117, of title 18, United States Code.[4]

17  **C.     Dr. Bararia's Wife and Parents Can No Longer Sustain This Family On Their Own,
18          Thus Warranting At Least a Two-Level Downward Departure For Exceptional
            Family Circumstances Under U.S.S.G. § 5H1.6.**

19         The U.S.S.G. recognizes that downward departure also may be appropriate to reflect the

20

---

21  [3] Dr. Roitman's reports explained that the complexities and intricacies of determining,
22  administering, and adjusting ("titrating") the proper medications exceed the abilities of the
    detention center staff. Dr. Bararia's unique circumstances exacerbate the situation as well. As a
23  very competent physician, his training renders his condition even more challenging to treat. The
    nature of his disease is such that, if not carefully and frequently evaluated by a highly competent
24  specialist, may cause him to draw upon his medical expertise to bring about an outcome only he
    desires. Dr. Bararia argued these points at length in his Motion to Reopen Detention Hearing
25  Based on New Medical Information (Doc. No. 95), and its corresponding Supplement (Doc. No.
    107).

26  [4] Alternatively, this Court appropriately may consider Dr. Bararia's bipolar disorder as an 18
    U.S.C. § 3553(a) characteristic of the defendant, and find his condition warrants a downward
27  variance because further incarceration is greater than necessary to meet the sentencing goals of 18
    U.S.C. § 3553.

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4841-0361-8073.1                                12                            2:12-cr-236-JAD-GWF

1    impact that incarceration may have on a defendant's family:

2        § 5H1.6. Family Ties and Responsibilities (Policy Statement)

3        In sentencing a defendant convicted of an offense other than an offense described
         in the following paragraph, family ties and responsibilities are not ordinarily
4        relevant in determining whether a departure may be warranted.

5        In sentencing a defendant convicted of an offense involving a minor victim under
         section 1201, an offense under section 1591, or an offense under chapter 71, 109A,
6        110, or 117, of title 18, United States Code, family ties and responsibilities and
         community ties are not relevant in determining whether a sentence should be below
7        the applicable guideline range.

8        Family responsibilities that are complied with may be relevant to the determination
         of the amount of restitution or fine.
9

10       Commentary

11       Application Note:

         1. Circumstances to Consider.
12
             (A) In General. In determining whether a departure is warranted under this policy
13       statement, the court shall consider the following non-exhaustive list of circumstances:

14           (i) The seriousness of the offense.

15           (ii) The involvement in the offense, if any, of members of the defendant's family.

             (iii) The danger, if any, to members of the defendant's family as a result of the offense.
16
             (B) Departures Based on Loss of Caretaking or Financial Support. A departure under this
17       policy statement based on the loss of caretaking or financial support of the defendant's
         family requires, in addition to the court's consideration of the non-exhaustive list of
18       circumstances in subdivision (A), the presence of the following circumstances:

19           (i) The defendant's service of a sentence within the applicable guideline range will
         cause a substantial, direct, and specific loss of essential caretaking, or essential financial
20       support, to the defendant's family.

21           (ii) The loss of caretaking or financial support substantially exceeds the harm
         ordinarily incident to incarceration for a similarly situated defendant. For example, the fact
22       that the defendant's family might incur some degree of financial hardship or suffer to some
         extent from the absence of a parent through incarceration is not in itself sufficient as a
23       basis for departure because such hardship or suffering is of a sort ordinarily incident to
         incarceration.
24
             (iii) The loss of caretaking or financial support is one for which no effective remedial
25       or ameliorative programs reasonably are available, making the defendant's caretaking or
         financial support irreplaceable to the defendant's family.
26
             (iv) The departure effectively will address the loss of caretaking or financial support.
27
         18 U.S.C.S. Appx § 5H1.6.
28

1    Sentencing courts that have departed downward because of a defendant's family

2   circumstances have exercised their broad discretion in so doing, thus yielding a wide variety of

3   reasons for the departure.  For example, in *United States v. Galante*, 111 F.3d 1029, 1034-37 (2d

4   Cir. 1997), a pre-*Booker* case, the court affirmed the departure based on family circumstances

5   from Offense Level 23 down to Offense Level 10, for which the defendant received a five-year

6   term of supervised release.  In *Galante*, the defendant's wife, a non-native speaker, could not earn

7   nearly as much as the defendant could, and the family's formerly strong and stable existence faced

8   certain destruction if the defendant were to be incarcerated. *Id.* The Second Circuit noted the

9   uniqueness and inherent subjectivity of the inquiry into a defendant's family circumstances, and

10   affirmed that such a departure was within the sentencing court's discretion.  Significant to Dr.

11   Bararia's case, the court noted that the intended beneficiary of this particular departure is not

12   really the defendant, but rather the defendant's family. *Id.* at 1035.  Similarly, in *United States v.*

13   *Gauvin*, 173 F.3d 798, 806-09 (10th Cir. 1999), which involved assault on an officer, the Tenth

14   Circuit affirmed the district court's downward departure for family circumstances where the

15   defendant's wife worked two jobs, had four children to care for, and needed the defendant out of

16   prison so that he could work and help support this family unit. *Gauvin*, 173 F.3d at 809. Over

17   government protest, the appellate court affirmed this departure even in light of the defendant's

18   "record of domestic abuse." *Id.* Ranges of downward departures for family circumstances are

19   similar to those for diminished capacity, between one and four levels. *See Menyweather*, 447 F.3d

20   at 635 ("Downward departures for extraordinary family circumstances most often fall within a

21   similar range [as diminished capacity]."). *See also Whitehead*, 532 F.3d at 993 (where court did

22   not find unreasonable the sentencing court's consideration, *inter alia*, that the defendant's eight-

23   year-old daughter depended on him in imposing a sentence of 1,000 hours of community service,

24   restitution, and five years of supervised release, although the defendant's Guidelines range

25   calculated out at 41 – 51 months).

26    Like the defendants' family circumstances in *Galante* and *Gauvin*, Dr. Bararia's family

27   circumstances require his presence for the emotional and financial support of his young children.

28   Dr. Bararia is fortunate to have "tremendous" support from his family, (PSR at ¶106), but they

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4841-0361-8073.1                                      14                                2:12-cr-236-JAD-GWF

1   need him to return to them.  Mrs. Bararia has weathered this family crisis for over 18 months,

2   shepherding their three children's early development on her own, but now their finances are

3   exhausted and she must find work to pay for basic necessities, including childcare for their young

4   son.  Though highly educated, as a stay-at-home mother for many years, Mrs. Bararia has been out

5   of the traditional job market, so she lacks current skills and experience which likely will hinder her

6   ability to make even a living wage, let alone enough money to cover childcare and basic expenses,

7   such as rent.  Compounding the difficulty of this transition is the fact that recently, Mrs. Bararia

8   has encountered health issues that may compromise her ability to find gainful employment.  But

9   even if she is healthy enough and does find work, childcare remains a real issue because Dr. and

10  Mrs. Bararia have no other family members who reside in Las Vegas.  In the past, Dr. Bararia's

11  mother, Uma Bararia, has helped with childcare when she visits her grandchildren from India, but

12  she has rheumatoid arthritis and a worsening back condition that now requires surgery. (*See* U.

13  Bararia Ltr., March 25, 2014, attached hereto as Exhibit I).  Her ability to care for an 18-month old

14  child would be limited, if not impossible, even if she could stay indefinitely.  Moreover, Dr.

15  Bararia's mother cannot drive, thus restricting her ability to help get the older children to school or

16  doctor's appointments or any extracurricular activities, such as Girl Scouts and honors' projects.

17  Dr. Bararia must contribute to his family's well-being beyond daily phone calls, lest these

18  innocent lives be further damaged. *See* Anne R. Traum, "*Mass Incarceration at Sentencing*," 64

19  Hastings L.J. 423, 433 (2013) ("Incarceration isolates parents from their children, removes

20  financial and caregiving support for the children, and imposes on the family the cost, time, and

21  stress of maintaining a relationship with an incarcerated parent.").  In short, his wife and children

22  need Dr. Bararia's support, either as a childcare provider or through gainful employment.

23      Dr. Bararia's family circumstances, however, extend beyond his wife and young children,

24  and include his elderly parents.  His parents have exhausted all of their financial resources,

25  accumulated over decades of public service, to help their only son in his hour of need.  They can

26  no longer financially support two households, and worry that their son will not be able to perform

27  his religious duties should they pass away before he is released. (*See* A. Bararia Ltr., March 24,

28  2014, attached hereto as Exhibit J).  While incarceration of any parent can have a negative impact

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4841-0361-8073.1                           15                    2:12-cr-236-JAD-GWF

1  on a family, here, the unique circumstances warrant at least a two-level downward departure.[5]

2  **D.    Abundant, Compelling Reasons Support At Least A Four-Level Downward Variance.**

3      **(1)    Dr. Bararia's Years Of Exceptional Dedication To His Medical Practice And Deep Faith Further Show The Aberrance Of His Illegal Conduct.**

4

5      Dr. Bararia's devotion to his patients, as evidenced by the numerous letters of support he

6  received from many of his former patients, has never been an issue in this investigation. These

7  letters are attached as Exhibit K.

8      In this era of managed care, the stress of cycling through as many patients as humanly

9  possible has driven up the rates of suicide, depression, and anxiety among physicians. Dr. Bararia,

10  as an internal medicine practitioner, faced these same pressures. He responded by refusing to cut

11  down on the time he spent with his patients, and by refusing to send non-paying patients to

12  collections. Additionally, he had a close relationship with Centennial Hills Hospital, agreeing to

13  serve as its first Chief of Internal Medicine (an uncompensated relationship). As a part of his

14  hospital privileges, Dr. Bararia provided "on-call" services, thus causing him to work 36 hours at a

15  time as frequently as his name appeared on the call schedule. His hospitalized patients required

16  daily "rounding," sometimes more, depending on their conditions. In short, Dr. Bararia worked

17  incredibly hard to meet the needs of his patients – not because of some financial windfall that

18  would come from such hard work, but because his duty to his patients compelled him to work as

19  hard as he did. Dr. Bararia was not trafficking in controlled substances because he was greedy and

20  wanted a nicer house. Dr. Bararia was bankrupt, manic, and trying to find ways to stay afloat

21  financially without compromising the excellent care he provided his patients. His conduct

22  represents tragic abandonment, literally going off the deep end.

23      Such an exceptional employment history, defined by *years* of commitment to others, often

24  under extreme stress of life-and-death decision-making that is part and parcel of a physician's

25  ─────────────────────

26  [5] Alternatively, this Court may consider Dr. Bararia's family circumstances as a factor under 18 U.S.C. § 3553(a) warranting a downward variance. *See United States v. Martin*, 520 F.3d 87, 89-90 (1st Cir. 2008) (court affirmed sentencing court's downward variance of 91 months based, in

27  part, on "the close relationship he has with his family who are here today and how important that relationship is.").

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  practice, merits a downward variance because it demonstrates the aberrance of Dr. Bararia's

2  behavior in the parking lot of Centennial Hills Hospital.

3       Furthermore, Dr. Bararia's religious practice consistently has been a major component of

4  his life. For example, before his arrest, Dr. Bararia was active in the local Hindi community,

5  helping to establish a temple. (See Y. Daulet Ltr., March 31, 2014, attached hereto as Exhibit L).

6  And, when agents seized property from Defendant's residence, one of the items they seized was

7  money he and his wife collected as a part of their religious offerings. Certainly, his faith has

8  helped him cope with the loss of his profession and the painful consequences his actions have had

9  on his family, but it also further demonstrates the aberrant nature of his illegal conduct.

10  Additionally, as his father poignantly makes clear in his letter of support, their faith is family-

11  based, and, except for the conduct at issue, Dr. Bararia honored his and his family's faith

12  consistently and sincerely.

13      **(2)    The Government's serial misconduct throughout "Operation Slumdog**

14      **Billionaire" should offset any relevant conduct as the drug quantities are trumped up and over represented as a direct result of the misconduct.**

15       Although Dr. Bararia did not meet the high evidentiary threshold to cause the Court to

16  dismiss the indictment on the basis of outrageous government misconduct, a downward variance is

17  nonetheless appropriate in these circumstances. The following list represents those actions (or

18  inactions) that expose the Government's flagrant disregard of laws and rules designed to protect an

19  individual's constitutional rights. A downward variance properly addresses the misconduct and

20  should deter the Government from future overreaching, which includes inappropriate racial slurs

21  toward a target and reprehensible threats to innocent family members.

22                     **The Wiretaps**

23       The Government secured a wiretap of Dr. Bararia's cellphone in January 2012, after video-

24  recording six purchases of controlled substances by the undercover agent from Dr. Bararia. In

25  addition to a requisite probable cause showing, the Government was, by statute, also required to

26  show that the wiretap was necessary because of its presumptively intrusive violation of a person's

27  reasonable expectation of privacy in his phone communications. *See United States v. Gonzalez,*

28  *Inc.,* 412 F.3d 1102, 1112 (9th Cir. 2005) (Only by proving a wiretap was necessary can the

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1    Government "overcome the statutory presumption against this intrusive investigative method.").

2    The Government's affidavit in support of its application for the wiretap, however, distorted and

3    misrepresented Dr. Bararia's conduct, so much so, that the Government failed to mention that the

4    confidential informant stated that Dr. Bararia was his own source of oxycodone and hydrocodone

5    (the very CS statement identified in the PSR at ¶¶7, 36)). Instead, the Government concocted a tale

6    of nefarious Armenian drug dealers, of which Dr. Bararia, who is Indian, was a principle

7    distributor in a "complex Armenian drug trafficking organization." The wiretap, the affidavit

8    contended, was necessary to root out the Armenian drug trafficking conspiracy in Las Vegas. The

9    affidavit discussed a then-recent bust of an actual Armenian criminal organization, one based in

10   New York, ostensibly to strengthen the viability of its theory that Dr. Bararia, a physician

11   originally from India, was involved in an Armenian criminal organization. However, the

12   Government already possessed multiple sources of analysis, such as mere phone records, that

13   showed no such thing was true. Thus, the Government omitted vital information from its affidavit

14   that would have allowed the authorizing judge to assess actual necessity.

15        Additionally, the affidavit misrepresented the investigative efforts leading up to the alleged

16   need for the wiretap. Specifically, the Magistrate Court found that the Government failed to

17   explain adequately why the undercover agent would not have succeeded in obtaining more

18   information about Dr. Bararia's source of supply. (Doc. No. 156 at 26:19-21). The recordings of

19   their transactions show that Dr. Bararia trusted the undercover agent, and such trust would have

20   enabled a deeper infiltration into Dr. Bararia's efforts to obtain controlled substances, such as

21   "introducing" her to his purported contacts. Well, of course no such contacts with organized

22   crime existed.

23        These were serious misrepresentations to the Court. These misrepresentations enabled the

24   Government to intercept communications over Dr. Bararia's cell phone. While wiretaps of

25   suspected drug traffickers are not so unusual, when the suspected drug trafficker is a physician, the

26   possibility of government agents listening and recording hundreds upon hundreds of privileged

27   communications was a true concern. The Government ignored this issue, and failed to set up

28   adequate procedures to safeguard patient privacy even though they knew this busy physician

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4841-0361-8073.1                    18                    2:12-cr-236-JAD-GWF

1  communicated frequently about private health matters over his cellphone (both in conversations

2  and in text messages). The authorizing order required the Government to pay "special attention"

3  to privileged calls, and the Government's own minimization instructions required careful

4  screening of privileged calls. However, consistently careful screening did not occur. (Findings

5  and Recommendations Denying Defendant's Motion to Suppress Wiretap for Failure to Minimize,

6  Doc. No. 162, at 13:14-18) ("Defendant has raised a legitimate argument as to whether the

7  Government should have ceased any interception of calls between Defendant and his wife once it

8  became apparent that their conversations did not relate to any criminal activity and there was no

9  evidence that Mrs. Bararia was involved in any ongoing criminal activity.").

10       As such, Dr. Bararia retained a former FBI special agent (Robert Clymer) who has

11  extensive experience conducting wiretaps to analyze this wiretap. His reports and detailed

12  analysis show a breathtaking situation where for sixty days, the Government intercepted hundreds

13  of calls that it was not authorized to intercept.[6] For example, Mr. Clymer opined that nearly 54%

14  of all the telephonic communications that the Government intercepted during the first 30 days of

15  the wiretap were privileged calls. (Clymer Supplemental Report at 11). Furthermore, during that

16  same time period only 1.63% of the telephonic communications pertained to the criminal activity

17  identified in the wiretap application, and 90% of those communications were between Dr. Bararia

18  and the confidential informant. (*Id.*). Indeed, Mr. Clymer opined that the Government improperly

19  minimized almost 81% of all telephonic communications during the second thirty days of the

20  wiretap. (*Id.* at 27). Moreover, Mr. Clymer opined that the Government had the technology to

21  identify *immediately* the source of an incoming call, including Centennial Hills Hospital, and thus

22  the Government's rampant violation of the wiretap orders regarding health-information

23

_____

24  [6] The Government's minimization instructions allowed the monitoring agents to intercept a call for
   a reasonable amount of time, not to exceed two minutes, to determine whether a call related to the

25  crimes alleged in the wiretap application. As the weeks wore on, agents became more experienced
   with the patterns of calls, yet continued listening for a full two minutes –or more—even when Dr.

26  Bararia spoke with individuals that agents had learned were completely uninvolved in any of Dr.
   Bararia's illegal conduct. Such conduct was unreasonable and violated the Court's order and the

27  Government's minimization instructions. (See R. Clymer Reports, attached hereto as Exhibits M
   and N).

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4841-0361-8073.1                              19                              2:12-cr-236-JAD-GWF

1  communications was without excuse. (*Id.* at 22). Even when the monitoring agents minimized

2  these health-information calls and doctor-patient calls, a troubling amount of private, privileged

3  information was recorded, including patients' names, medications, and conditions. (*Id.*).

4       In addition to the failure to properly minimize health-information and physician-patients

5  communications, the Government also failed to minimize a notable number of communications

6  between Dr. Bararia and his attorneys. This is most evident after Dr. Bararia had been released

7  following his arraignment. As Mr. Clymer's reports show, the Government intercepted and failed

8  to minimize text messages between Dr. Bararia and his attorneys, and ceased even their minimal

9  efforts to minimize communications between Dr. and Mrs. Bararia wherein Dr. Bararia discussed

10  his conversations with his defense attorneys. (Clymer Supplemental Report at 17).

11       A call on February 16, 2014 stands out as the low-point of this unnecessary and

12  unreasonable search of Dr. Bararia's privileged communications. On that day, agents intercepted

13  a phone call between Dr. Bararia and his wife.[7] Like many other times during this wiretap, agents

14  listened well past any reasonable point to justify violating the prohibition against intercepting

15  privileged calls. (R. Clymer Supp. Report at 23-24). Yes, agents minimized this call, but only after

16  listening for 3 minutes and 39 seconds. (*Id.*). As the minutes and seconds ticked by, agents

17  continued to record an extraordinary conversation between a husband and wife, who had newly

18  learned they were expecting their third child. They spoke of confirming the pregnancy via blood

19  test, of which OB-GYN Mrs. Bararia should see, and throughout this, they lapsed in and out of

20  English into Hindi. Their tones were tender as they spoke of such deeply intimate matters -- and

21  yet the monitoring agents listened for 3 minutes and 39 seconds. The intrusion was a clear and

22  inexcusable violation of the order authorizing the wiretap and the minimization instructions, but

23  the Government's misconduct with regards to this call did not end there. Instead, on March 1,

24  2012, upon executing the search warrant of Dr. Bararia's residence, the case agent (who had

25  authored the affidavit in support of the Government's application for the wiretap), informed Mrs.

26

27  _____

[7] A .wav file of the interception is attached hereto as Exhibit O.

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4841-0361-8073.1                                          20                              2:12-cr-236-JAD-GWF

1 || Bararia that their doctor days were over, and her unborn son would not see his father until he was

2 || an adult.[8] Mrs. Bararia has sworn out an affidavit attesting to this exchange. Mrs. Bararia's

3 || affidavit is attached as Exhibit P.

4 ||     Moreover, Mr. Clymer stated that he "highly suspects" that the Government continued to

5 || use the confidential informant after the point at which the wiretap affidavit stated she had been

6 || terminated for being unreliable. (R. Clymer Report at 11). Mr. Clymer concluded the confidential

7 || informant likely was a "hip pocket source." (*Id.*). A hip-pocket source refers to a confidential

8 || source who has been terminated on paper, but used by agents surreptitiously to "tickle the wire,"

9 || that is, to gin up illicit activity to justify the wiretap. (*Id.*).

10 ||     Together, these misrepresentations to the Court regarding the necessity for the wiretap and

11 || the lawless administration thereof show that the Government pervasively disregarded Dr. Bararia's

12 || (and his family's and patients') right to be free from unreasonable searches and seizures while

13 || violating the statutes governing wiretaps at 18 U.S.C. § 2510 *et seq.* On the eve of Dr. Bararia's

14 || evidentiary hearing on his Motion to Suppress the Wiretap for Failure to Minimize, the parties

15 || finalized a plea agreement, thereby obviating the need for the hearing. The Government dodged

16 || an embarrassing bullet, but a significant downward variance would promote the Government's

17 || sworn duty to respect the law as it pertains to the proper administration of a wiretap in future

18 || cases.

19 || **The Confidential Informant:  Sari Gray**

20 ||     Sari Gray's involvement inexcusably tainted this investigation. Dr. Bararia had an

21 || intimate relationship with Sari Gray during the very time that the Government relied on her to

22 || establish trust between Dr. Bararia and the undercover agent – and the Government was aware of

23 || it. (S. Smith Report of Investigation, Aug. 1, 2011, at 1, attached hereto as Exhibit Q). Further

24

25 || [8] Mr. Clymer opined that this shows that the proper protection of privileged communications, as

26 || required by the authorizing order and the minimization instructions, failed to occur here.
Privileged communications were to be sealed off from the case agent, but TFO Melvin's cruel

27 || statements shows he had access to privileged communications. There were no other interceptions
relating to the Bararias' pregnancy, thus the February 16, 2012 calls were not sealed off.

28

1  evidence that the Government knew about an intimate relationship can be found in the

2  Government's second Ten Day Progress Report on the wiretap for the period of January 17, 2012

3  through January 26, 2012. There, the Government described Sari Gray as "a patient and former

4  paramour of Dr. Bararia," but offered no explanation as to how the Government came to possess

5  that information. (P. Walsh, Ten Day Progress Report, Jan. 31, 2012, at 3, attached hereto as

6  Exhibit R). The wiretap captured a number of communications between Dr. Bararia and Sari Gray,

7  including a strange exchange on January 21, 2012, which forms the basis of Mr. Clymer's opinion

8  that Sari Gray was a hip-pocket source. On that day, she arranged to meet with Dr. Bararia.

9  (Exhibit L, R. Clymer Report, at 43-44). On her way from the meeting, she called Dr. Bararia and

10  launched into a long conversation about the undercover agent. (*Id.*). Surprisingly, she wasn't

11  ratting out the undercover agent. Instead, even though she was no longer an informant, she told

12  Dr. Bararia a fanciful story about hearing that the undercover agent had been in jail for a while,

13  thus explaining why he hadn't heard from her in several months. (*Id.*). A little while later, Sari

14  Gray called Dr. Bararia to tell him she had been pulled over on the 215, just past Cheyenne. (*Id.*,

15  DEA Pertinent Calls Report, Mar. 29, 2012, at US-000993-998, attached hereto as Exhibit S).

16  Although the stop occurred just a stone's throw away from Metro's Northwest Area Command,

17  officers from North Las Vegas arrived on the scene and executed a canine search. (Exhibit L, R.

18  Clymer Report, at 43-44). Ms. Gray's pills were confiscated, but she was not arrested at that time.

19  (*Id.* at 44). Notably, Ms. Gray received only a year of probation despite her extensive criminal

20  record (far more extensive than Dr. Bararia's), including an ongoing case involving insurance

21  fraud.[9] (*See* S. Gray Criminal Case Docket History, Eighth Judicial District, available at

22  https://www.clarkcountycourts.us/Anonymous/Search.aspx, last accessed on April 7, 2014,

23  attached hereto as Exhibit T). Subsequently intercepted communications included, for the first

24  time, Sari Gray trying to persuade Dr. Bararia to write specific prescriptions for her. (Ex. L, R.

25

26  ────────────────

27  [9] Interestingly, North Las Vegas police officers constituted a significant number of the task force
officers in this DEA investigation (including the case agent, Jeremy Melvin and NLV Investigator
Shane Skipworth).

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  Clymer Report, at 44). Ironically, Dr. Bararia authorized his staff to report Sari Gray when she

2  tried to get a prescription filled that Dr. Bararia had not written. (Ex. R at US-0001069-70).

3       In short, the Government used an unreliable source, misrepresented its use of the source to

4  the Court, and charged around its use to avoid discovery obligations that include disclosing her

5  confidential informant file to Dr. Bararia.

6                    **Further Misconduct and Sentencing Entrapment**

7       The Government also purposefully trumped up the drug amounts.  By the end of July 2011,

8  the Government clearly had enough to convict Dr. Bararia of drug trafficking.  But instead of

9  arresting Dr. Bararia, which would have immediately ended any his access to controlled

10  substances and prevented any further harm to the public good, agents elected to proceed onward,

11  dubbing this investigation "Operation Slumdog Billionaire." On June 1, 2011, the undercover

12  agent purchased approximately 1,000 hydrocodone pills, and another 1,000 hydrocodone pills on

13  June 16, 2011. (J. Melvin Aff., Jan. 3, 2012, at 12-14, attached hereto as Exhibit U). Hydrocodone

14  is a Schedule III drug, with a much lower marihuana equivalency than oxycodone (500g compared

15  with 6700g). U.S.S.G. §2D1.1. The undercover agent purchased hydrocodone once more, on July

16  20, 2011 (the transaction for which Dr. Bararia pleaded guilty). (*Id.* at 15-16). Subsequent

17  transactions, however, all were for oxycodone: 914 pills on July 28, 2011; 1,300 on August 22,

18  2011; 1,120 pills on September 22, 2011; 266 pills on November 8, 2011; and, 1,800 pills on

19  March 1, 2011. (*Id.* at 17-26, C. Johnson Report of Investigation, Mar. 3, 2012 at 2, attached

20  hereto as Exhibit V). Indeed, the Government had tried to arrange for a purchase of 3,000

21  oxycodone pills from Dr. Bararia, but he was unable to obtain that many. (See Ex. U, J. Melvin

22  Aff., at 25). Based on the U.S.S.G. Drug Quantity Table, such a large purchase would have

23  resulted in yet another two-level increase.

24       The undercover agent's attempts to purchase cocaine also show the Government's attempt

25  to increase the sentence that Dr. Bararia would face.  Without any indication that Dr. Bararia ever

26  distributed cocaine, at the July 28, 2011 transaction, the agent asked Dr. Bararia whether his

27  source of supply for oxycodone could sell her cocaine. (See C. Prochnow Report of Investigation,

28  Aug. 1, 2011 at 2, attached hereto as Exhibit W). Dr. Bararia advised the undercover agent that he

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4841-0361-8073.1                              23                        2:12-cr-236-JAD-GWF

1  didn't know, but, at her request, he would ask. (*Id.* at 3). She repeated her request again on

2  November 8, 2011, November 25, 2011, December 5, 2011, and December 28, 2011. (See Exhibit

3  T, J. Melvin Aff., at 23-26). Interestingly, depending on the amount, a cocaine transaction could

4  have resulted in a mandatory minimum sentence of ten years pursuant to 21 U.S.C. §

5  841(b)(1)(A)(ii)(II). But of course there was no cocaine and the only buyer here was a government

6  agent.

7       Midway through these larger and larger transactions, "Operation Slumdog Billionaire"

8  became a priority investigation, gaining OCDETF status on September 29, 2011. (C. Johnson

9  Report of Investigation, Oct. 18, 2011, attached hereto as Exhibit X).[10]  The choice of name for

10  this investigation remains a particularly troubling one, so much so that the Magistrate Court

11  labeled it "deplorable." (Doc. No. 156 at 32:1). The name cuts at both ethnicity and

12  socioeconomic status, and reveals a distasteful prejudice among those sworn to uphold the rule of

13  law.  Among Dr. Bararia's Hindi community especially, the name signifies ethnic and cultural

14  degradation and targeting, especially as used in this context and for no other purpose. (See Ex. L,

15  Y. Daulat Ltr.).

16       Dr. Bararia respectfully maintains that the Government's tainted investigation should not

17  be condoned by punishing Dr. Bararia for conduct beyond that to which he pleaded guilty.  Later

18  transactions, though technically relevant under USSG § 1B1.3, were purely contrived by the

19  Government as a part of an overreaching investigation, where each subsequent purchase escalated

20  the quantities.  Whether labeled "government misconduct" or "sentencing entrapment," it is proper

21  to exclude it from consideration when determining an appropriate sentence. *See United States v.*

22  *Garza-Juarez*, 992 F.2d 896, 913 (9th Cir. 1993) (where court recognized that "persuasion alone,

23  not threats" may be an appropriate basis for a downward departure); *United States v. McClelland*,

24  72 F.3d 717, 726 (9th Cir. 1995) ("In fact, evidence of imperfect entrapment, like evidence of

25  imperfect coercion, is in some cases a legitimate ground for departure, because it may show that

26  _____

27  [10] OCDETF stands for "Organized Crime Drug Enforcement Task Force." (See
http://www.justice.gov/criminal/taskforces/ocdetf.html, last accessed on March 12, 2014).

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4841-0361-8073.1                          24                          2:12-cr-236-JAD-GWF

1  the defendant is 'both less morally blameworthy than an enthusiastic [defendant] and less likely to

2  commit other crimes if not incarcerated.'"); *United States v. Searcy*, 233 F.3d 1096, 1099 (8th Cir.

3  2000) ("To ameliorate the danger of government abuse we have recognized sentencing entrapment

4  as a viable theory for a downward departure under the Sentencing Guidelines."). These cases

5  predate *Booker*, and as argued above, this Court's ability to look at such conduct as a basis for a

6  downward variance certainly falls within the nature and circumstances of the offense. 18 U.S.C. §

7  3553(a)(1).

8
9

    **(3)**     **Further incarceration has no effect on the fact that Dr. Bararia is now a physician in title only: he has lost and cannot regain the career to which he devoted the majority of his life to as a student and then as a practitioner.**

10      Dr. Bararia is no longer a licensed physician, and cannot practice medicine again.  On July

11  24, 2012, the Nevada Board of Medical Examiners summarily suspended Dr. Bararia's license to

12  practice medicine.  Dr. Bararia surrendered his medical license on March 8, 2013.  Under Nevada

13  statute, his summary suspension and his conviction of a controlled substance felony are grounds to

14  preclude him from regaining his license. *See* NRS 630.301(11)(f) (felony conviction of federal

15  violation of controlled substance laws ground for denying license).

16      Dr. Bararia, like most physicians, worked extremely hard as an undergraduate to get

17  accepted into medical school (four years of intense education), then residency (at least three years

18  of grueling training with little pay), and then built a career that was both incredibly demanding and

19  rewarding.  This future, however, no longer belongs to him.  The U.S. Probation Officer

20  understood this: "[T]he loss of his ability to practice medicine is . . . a tremendous punishment to

21  someone who seems so focus[ed] on success, prestige, and respect." (PSR at 21). This punishment

22  is permanent, and provides sufficient respect for the law and deterrence to all who would similarly

23  consider jeopardizing their medical license.

24
25

    **(4)**     **Dr. Bararia's 18 months in detention, during which he exhibited exemplary behavior while suffering a serious medical condition, also shows he remains committed to service to others.**

26      Defendant has been detained for 18 months.  During that time, he has been a model

27  detainee.  He has assisted other pretrial detainees in their efforts to obtain a GED and to learn

28  English. (See Ex. B, P. Cook Ltr.).  Short of agreeing to submit himself to a medically questionable

1  course of treatment for his bipolar disorder while in pretrial confinement, Defendant has

2  nonetheless availed himself of multiple opportunities to improve himself.  He consistently engages

3  in the practices of his religion, including meditation and prayer. He draws and writes stories for

4  children.  He participates in alcohol abuse counseling.  He has regained physical fitness.

5          **(5)    A demonstrable and palpable remorse for his conduct and for the impact it
                    has had on his family is already evident in Dr. Bararia.**

6          Bhavna Bararia prepared a letter for this Court's consideration at sentencing, and it reveals

7  the deep remorse she has seen in her husband. (*See* B. Bararia Ltr., March 28, 2014, attached

8  hereto as Exhibit Y). She described a father who speaks daily with his children, even helping them

9  with their homework over the phone, and who apologizes daily to his wife for what he has done to

10  their family.[11] Dr. Bararia's family has experienced other collateral consequences, as, unlike most

11  families of defendants arrested for similar conduct, Dr. Bararia's family had to endure intense

12  media scrutiny upon his arrest and arraignment.  How the media learned of his arrest remains

13  unclear, but the logical conclusion is that someone associated with the Government's investigation

14  or prosecution of Dr. Bararia spoke to the media about a doctor distributing controlled substances.

15  Simply, as Mrs. Bararia wrote:

16          Vinay has always been a devoted father and husband and the past eighteen months
            have made him realize even more what he stands to lose.  Every day he wishes he
17          could hold his son who does not even know him.

18  (*Id.*). Dr. Bararia's own letter echoes this sentiment and his keen desire to repay all that he has cost

19  his family, financially and emotionally:

20          Not only would I like to apologize to the court, but would like to apologize to my
            family for what I have put them through and the shame and dishonor I have brought
21          to them.  For this, I will never be able to forgive myself.  At my age I am supposed
            to support my parents, instead I have brought them worry and stress.
22

23  (*See* V. Bararia Ltr., attached hereto at Exhibit Z).

24                          **APPROPRIATE PUNISHMENT**

25          In holding that a sentence of three years of probation in lieu of 30 – 37 months of

26  imprisonment was reasonable, the U.S. Supreme Court in *Gall* signaled to sentencing courts that

27  _____
    11

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4841-0361-8073.1                    26                    2:12-cr-236-JAD-GWF

1  options to incarceration can meet the requirements of 18 U.S.C. § 3553:

2    We recognize that custodial sentences are qualitatively more severe than
     probationary sentences of equivalent terms. Offenders on probation are
3    nonetheless subject to several standard conditions that substantially restrict their
     liberty. . . . Probationers may not leave the judicial district, move, or change jobs
4    without notifying, and in some cases receiving permission from, their probation
     officer or the court. They must report regularly to their probation officer, permit
5    unannounced visits to their homes, refrain from associating with any person
6    convicted of a felony, and refrain from excessive drinking. Most probationers are
     also subject to individual "special conditions" imposed by the court. Gall, for
7    instance, may not patronize any establishment that derives more than 50% of its
     revenue from the sale of alcohol, and must submit to random drug tests as directed
8    by his probation officer.

9  *Gall*, 552 U.S. at 48-49 (internal citations omitted). In particular, the Court noted with approval

10 the sentencing court's explanation for imposing probation instead of incarceration "'not as an act

11 of leniency,' [but rather] as "'a substantial restriction of freedom.'" *Id.* at 44. Indeed, sentencing

12 options even more restrictive than probation are available for this Court's consideration, including

13 home confinement and community confinement. For example, in *Edwards*, the sentencing court

14 ordered that seven months of the defendant's five years of probation be served under house arrest.

15 *Edwards*, 595 F.3d at 1009.

16     Here, the U.S. Probation Officer recommended certain special conditions be imposed

17 during Dr. Bararia's supervised release, including mental health treatment, and strict restrictions

18 pertaining to his employment in the field of health care. (PSR at 24). These restrictions, if imposed

19 during a period of home or community confinement, would substantially restrict Dr. Bararia's

20 freedom, and, as with the defendant in *Gall*, who received only probation, provide for a sentence

21 that is not greater than necessary to meet the requirements at 18 U.S.C. § 3553. This is especially

22 so in light of Dr. Bararia's permanent loss of his medical license and his 18 months of pretrial

23 confinement.

24 / / /

25 / / /

26                                   **CONCLUSION**

27     Based on the foregoing, Dr. Bararia respectfully submits that his proposed sentence of no

28 more than 30 months (Offense Level 19) with no more than 12 months served by home detention,

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  followed by three years of supervised release is sufficient, but not greater than necessary, to meet

2  the requirements of 18 U.S.C. § 3553.

3       DATED this 7th day of April 2014

4                      Respectfully submitted,

5                      LEWIS BRISBOIS BISGAARD & SMITH LLP

6

7

8          By      /s/ Kathleen Bliss

9                   KATHLEEN BLISS
                 Nevada Bar No. 7606

10                   CHERYL A. GRAMES
                 Nevada Bar No. 12752

11                   6385 S. Rainbow Boulevard, Suite 600
                 Las Vegas, Nevada 89118

12                   Tel.   702.893.3383

13                   THOMAS A. MESEREAU, JR., ESQ.
                 California Bar No. 091182

14                   MESEREAU & YU, LLP
                 10390 Santa Monica Blvd., Ste. 220

15                   Los Angeles, CA 90025
                 TEL:  310.789.1177

16

17                   Attorneys for Vinay Bararia

18

19

20

21

22

23

24

25

26

27

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1

## CERTIFICATE OF SERVICE

2          I hereby certify that a true and correct copy of the foregoing was served upon the following

3   counsel of record via hand-delivery and the Court's ECMF system on April 7, 2014:

4
    Susan Cushman, Esq.
5   Assistant U.S. Attorney
    U.S. Attorney's Office
6   333 Las Vegas Boulevard South
    Suite 5000
7   Las Vegas, NV 89101

8
                                            */s/ Crystal Marshall*
9                                            Secretary to Kathleen Bliss, Esq.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4841-0361-8073.1                          29                      2:12-cr-236-JAD-GWF